**TRACER RESEARCH CORPORATION, Plaintiff,**

**v.**

**NATIONAL ENVIRONMENTAL SERVICE COMPANY, dba NESCO; Lab One Analytical, Inc.; Eddy Patterson; Albert McCutchan, Defendants.**

**Civ. 93–180 TUC ACM.**

United States District Court, D. Arizona.

Order & Findings Sept. 3, 1993.

Memorandum of Decision Sept. 17, 1993.

David R. Shaub, Shaub & Williams, Los Angeles, CA, David G. Rosenbaum, Rosenbaum & Schwartz, P.A., Scottsdale, AZ, for plaintiff.

Frank J. Catalano, Catalano, Zingerman & McKay, Tulsa, OK, Diane Madenci, Brown & Bain, P.A., Tucson, AZ, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARQUEZ, Senior District Judge.

The Court hereby finds and concludes as follows:

## FINDINGS OF FACT

To the extent these Findings of Fact are deemed to be Conclusions of Law, they are

hereby incorporated into the Conclusions of Law that follow.

A. IDENTITY OF THE TRACER TIGHT PROCESS

1. Tracer Research Corporation's (Tracer) "Tracer Tight" leak detection system consists of:

a) United States Patent Numbers 4,725,-551, 4,709,577, 5,046,353, and 5,048,324;

b) Confidential Information, defined as all Tracer leak detection system information developed and owned by Tracer not covered by its patents, relating to its Tracer Tight process; and

c) Proprietary Equipment and Supplies, including probe caps, monuments, tracer chemicals, tracer containers, tracer dispensers, and inoculation forms (Shannan Marty RT 1:41).

2. Certain essential elements of Tracer's Confidential Information and Proprietary Equipment and Supplies set forth in the "Outline of the Tracer Tight Trade Secret Process" (Ex. 38) characterize Tracer's leak detection system process as a whole. These include the items set forth in Exhibit 1 hereto, submitted under seal.

B. RESEARCH AND INVESTMENT TO DEVELOP THE TRACER TIGHT PROCESS

1. Dr. Glenn Thompson, the founder of Tracer Research Corporation has Bachelor's, Master's and Ph.D degrees in Geology.

While teaching at the University of Arizona in the 1970's, he conducted research on tracers for all types of environmental applications. During this seven-year period, he became very familiar with all of the chemicals used today in the Tracer Tight leak detection system.

Around 1983, state regulators began to require tank testing and Dr. Thompson began experimenting to determine how readily various tracers could be used to leak test fuel tanks. This involved tests to determine evaporation of the tracer once the fuel leaked out of the tank, evaluation of tracers mixed into fuel, and migration of chemical vapors in the soil. No other such research was going on in the country at the time. As a result of his research, he obtained two patents dealing with leak detection (Glenn Thompson RT 1:5, 6, 7).

Dr. Thompson left the University in 1983 and founded Tracer Research Corporation in 1984.

2. Tracer developed over a number of years a unique process for testing storage tanks and pipelines based upon the use of chemical tracers injected into liquids in the liquid phase and detected outside a storage tank or pipeline in the gas phase (Glenn Thompson RT 1:10–11; Randy Golding RT 1:132; 1:147–148).

3. It took Tracer years of research to ascertain the tracers most likely to succeed in a leak detection process like the Tracer Tight process. Since 1983, Tracer has continued to determine new tracers which will work well in the process (Randy Golding RT 1:147–148).

4. Tracer has continued to perfect its process. For example, the first contract it got was for a group of 50 tanks. It took Tracer six months to complete the job. Today, it would take two people about one week to do the same testing.

One of the biggest problems from the beginning was contamination from handling the chemicals. There are critical aspects of handling the chemicals that must be followed to avoid contamination of the samples—the soil, etc. Procedures to avoid contamination were developed and put in the Standard Operating Procedures Manual and are not disclosed in Tracer's patents.

Later problems developed stemming from the low permeability of soil in which some of the tanks were sitting. Special procedures were developed and are now being used to deal with low permeability soils. These procedures are found in Tracer's procedures manual and not disclosed in the patents (Glenn Thompson RT 1:17).

5. It took Tracer several years to arrive at the tracer target concentration (Randy Golding RT 1:117). Development of the proper aerosol canister took time and money.

The present canister is manufactured for Tracer Research.

The first canisters used by Tracer leaked the chemical at an unacceptable rate. This caused undue contamination (Ex. 42). Exhibit 43 is a canister used later by Tracer. This has a different valve and it leaks less than Exhibit 42, however, Tracer decided that it was leaking excessively for its purposes and was causing contamination. Exhibit 44 is the aerosol canister presently used by Tracer. It is manufactured by a company called Great Lakes. Exhibit 44 has a label "Tracer D." This is the code Tracer gave the canister to keep secret the identity of the tracer chemicals.

After convincing the Air Force that the use of tracers for testing fuel tanks was practical, the Air Force still had great concerns about the injection of tracer chemicals into the fuel. As a result, it was necessary to reveal to the Air Force the chemical compounds that were used in the Tracer process. Tracer made it clear that this was confidential information. Although the patent discloses tracer compounds that can be used in the process, it lists 16–20 halons. Tracer did extensive experimentation in deciding exactly which halon to use. This began in the early 1970's with Dr. Thompson's experimentation, and is ongoing to this date. Tracer invested approximately ten years into the selection of the proper halon. The chemicals which Tracer uses were provided to NESCO for the purpose of inoculation of tanks. If any disclosure of the chemicals being used was necessary to be disclosed to customers, Tracer required a confidentiality agreement.

6. In some years, Tracer's research and development costs have been $400,000–$500,000, annually (Randy Golding RT 1:148).

7. Tracer's selection of the most appropriate tracers was determined after the patents issued (Randy Golding RT 1:132).

8. The process which Tracer disclosed to the Defendants evolved from the time the patents issued (Randy Golding RT 1:132).

9. Tracer completed the essential development of the Tracer Tight process shortly before it was disclosed to NESCO in about 1988 (Randy Golding RT 1:132).

10. The Environmental Protection Agency (EPA) adopted standards for tracer-based tank testing based upon Tracer's unique non-volumetric tank testing process (Glenn Thompson RT 1:9–10).

11. Tracer's Tracer Tight process has been listed by the EPA as having been certified by a third-party evaluation to be in compliance with EPA regulations (Randy Golding RT 1:107–108).

### C. TRACER'S MAINTENANCE OF CONFIDENTIALITY OF THE TRACER TIGHT PROCESS

1. Tracer's efforts to maintain confidentiality of the Tracer Tight process include:

a) employment agreements with key employees (Shannan Marty RT 1:34; Exs. 6, 7, 8);

b) confidentiality statements in the Tracer employee handbook (Shannan Marty RT 1:34);

c) disclosing information on the Tracer Tight process to employees who do not sign employment agreements only on a need-to-know basis (Shannan Marty RT 1:36–37).

2. Tracer has consistently used and uses non-disclosure agreements with all prospective licensees (Shannan Marty RT 1:39).

3. Tracer did not and does not disclose any of its proprietary information to any prospective licensees before said licensee signs the Non–Disclosure Agreement (Shannan Marty RT 1:39).

4. After a prospective licensee signs the Non–Disclosure Agreement, Tracer provides certain general information on the Tracer Tight process, such as the kind of equipment used in the process and the pricing structures, in order to permit further evaluation by the prospective licensee (Shannan Marty RT 1:41–42).

5. After a licensee signs Tracer's standard License Agreement, the licensee receives training and more detailed confidential information concerning the Tracer Tight process (Shannan Marty RT 1:42).

6. Tracer required and requires employees of licensees trained in the use of the

Tracer Tight process to sign individual Non–Disclosure Agreements to ensure their treatment of the information provided during training by Tracer as confidential (Shannan Marty RT 1:51).

7. Tracer's disclosures covering the Tracer Tight process to the Air Force were limited and made with a reasonable expectation of confidentiality (Glenn Thompson RT 1:25–26).

8. Tracer's disclosures to the EPA to enable the EPA to adopt standards for the Tracer Tight tank testing process were general in nature, reasonable in scope, and did not disclose the Tracer Tight process in its entirety (Glenn Thompson RT 1:10).

9. Tracer's efforts to maintain confidentiality with state agencies include notifying the state agencies in writing that the information provided by Tracer is proprietary and should be maintained confidential (Ex. 37, memorandum submitted to the State of Washington, detailing the Tracer Tight process and identifying it as confidential) (Randy Golding RT 1:135–136).

10. When Tracer has submitted or does submit its Standard Operating Procedures Manual to a state agency or the EPA, Tracer identified/identifies it as confidential (Glen Lyon RT 3:17; Randy Golding RT 1:136).

11. From at least as early as January of 1992, Tracer has used a standard letter attached to submissions to regulators identifying the information submitted by Tracer as a trade secret (Randy Golding RT 2:81).

12. To maintain confidentiality, Tracer has always requested the return of Proprietary Equipment, Supplies and materials containing confidential information from licensees when they cease being licensees (Randy Golding RT 2:81–82).

D. DISCLOSURE BY TRACER TO DEFENDANTS OF THE TRACER TIGHT PROCESS PURSUANT TO A CONFIDENTIAL RELATIONSHIP

1. Plaintiff and Defendant NESCO executed the Non–Disclosure Agreement in about August, 1990 (Ex. 10; Shannan Marty RT 1:39–40).

2. Plaintiff and Defendant NESCO executed the License Agreement on or about September 21, 1990 (Ex. 12).

3. Defendant Patterson returned the signed License Agreement under cover of a letter dated September 21, 1990 (Ex. 11). In that letter, he confirmed that Glen Lyon would be at NESCO for training on September 27, 1990 (Shannan Marty RT 1:44).

4. After NESCO signed the License Agreement, Tracer provided NESCO with information in addition to that provided when the Non–Disclosure Agreement was signed (Shannan Marty RT 1:45).

5. Defendants Eddy Patterson and Albert McCutchan are and have been at all times relevant to these Findings of Fact the only shareholders, officers and directors of Defendants NESCO and Lab One, including the time at and during which the Non–Disclosure Agreement and the License Agreement were executed and have been in force (Glen Lyon RT 3:24–25, and pursuant to stipulation).

6. Certain of NESCO's employees trained by Tracer in the use of the Tracer Tight process executed non-disclosure agreements with Tracer (Ex. 16; Shannan Marty RT 1:51).

7. Tracer disclosed its Confidential Information and furnished its Proprietary Equipment and Supplies to NESCO only after NESCO signed the Non–Disclosure Agreement and License Agreement (Shannan Marty RT 1:45–46).

8. Tracer provided NESCO with a list of chemicals to use in the Tracer Tight process, after NESCO signed the License Agreement (Randy Golding RT 2:57).

9. Tracer further disclosed to NESCO pursuant to the Non–Disclosure Agreement Tracer's pricing structure, including pricing for supplies, materials and equipment. The pricing information was provided only to Tracer affiliates (Glen Lyon RT 3:38–39).

10. The License Agreement obligated NESCO to refrain from any use of the Tracer Tight process not authorized by the License Agreement and any unauthorized disclosures of the Confidential Information

furnished by Tracer to NESCO during and after the term of the License Agreement (Ex. 11, ¶ 5.5, 5.8 and 5.9).

E. DEFENDANTS' MISAPPROPRIATION OF THE TRACER TIGHT PROCESS

1. Prior to executing the Non–Disclosure Agreement (Ex. 10), NESCO had not developed, owned or used any leak detection system using chemical tracers injected into liquids in the liquid phase and detected outside a storage tank or pipeline in the gas phase (Glenn Thompson RT 1:22; David Iacoe RT 1:75).

2. Defendants had access to Tracer's Confidential Information and Proprietary Equipment and Supplies only by reason of the License Agreement and Non–Disclosure Agreement NESCO executed (Shannan Marty RT 1:45–46).

3. About April or May of 1992, Defendants Patterson and McCutchan directed David Iacoe, an employee of NESCO and then Lab One, to begin to develop a leak detection process on behalf of Lab One (David Iacoe RT 1:75).

4. In June and July of 1992, Iacoe started to develop a leak detection process for Lab One, using the Tracer Tight third-party evaluation and other materials concerning the Tracer Tight process NESCO provided to him (David Iacoe RT 1:77).

5. Iacoe investigated the tracer chemicals process Tracer used and determined to use Tracer's tracer chemicals for Lab One (David Iacoe RT 1:81).

6. Iacoe used the Material Safety Data (MSD) sheets supplied by Tracer to NESCO under the License Agreement to derive the identity of the tracer chemicals (David Iacoe RT 1:82).

7. Iacoe determined the amount of tracer to use in inoculation from the Tracer third-party evaluation (David Iacoe RT 1:82).

8. Lab One investigated tracer dispensers, starting out with the Tracer cans, and decided to use the same (David Iacoe RT 1:81).

9. Defendants' objective was to have a marketable process by November of 1992. In order to meet this time frame, their approach was to take what Tracer developed and, working backwards, change as much as possible (David Iacoe RT 1:95–96).

10. McCutchan and Patterson told Iacoe not to worry about the similarities between the Tracer Tight process and the process Lab One was developing, because they had talked with an attorney (David Iacoe RT 1:83).

11. Patterson told Iacoe that if the new Lab One process could be developed and sold, the Defendants "would be able to make more from that than what it would cost them to defend" (David Iacoe RT 1:84).

12. All of the elements of the Tracer Tight process identified in Findings of Fact A 2. are trade secrets of Tracer which are being used by Defendants (Randy Golding RT 1:136).

13. Defendants are using only tracers that they learned to use as a Tracer licensee (Randy Golding RT 1:151; 2:44–45).

14. Defendants' inoculation process is virtually identical to that of Tracer (Randy Golding RT 1:151).

15. Defendants are pre-packaging their tracer in aerosol cans in quantities needed to achieve the target concentrations in the tanks in a manner "virtually identical" to Tracer's (Randy Golding RT 1:154).

16. Lab One uses the same probe placements and the same probe depth as Tracer (Randy Golding RT 1:146).

F. DEFENDANTS' COPYING OF TRACER'S THIRD–PARTY PERFORMANCE EVALUATION OF THE TRACER TIGHT PROCESS

1. The EPA requires certification by a third party that the process used to test a tank's tightness meets the EPA's requirements (Randy Golding RT 1:104; 1:107–108).

2. The third-party evaluator utilizes the EPA protocol to perform the evaluation of the test method or process developed by the service provider (Glen Lyon RT 2:161).

3. Many state agencies require submission of a third-party evaluation as part of the filing to obtain approval from the regulators of a service provider's process (Randy Golding RT 1:105).

4. The third-party evaluation permits the state agency to determine whether the evaluation was done according to the EPA's protocol and meets the state's requirements (Glen Lyon RT 2:162).

5. In conducting the third-party evaluation of Lab One's process, NESCO used existing sites which had previously been tested using the Tracer Tight process and proven tight within the last six months and further used equipment that was installed for use in the Tracer Tight process (David Iacoe RT 1:86).

6. Defendants provided their third-party evaluator, Dr. Potter, with a copy of Tracer's third-party performance evaluation, which he relied upon to prepare Lab One's third-party evaluation of the Search process (David Iacoe RT 1:92–93; Potter Deposition RT 3:63–69).

7. Dr. Potter, when conducting his third-party evaluation of the Search method, evaluated sites that had been previously tested by NESCO as a Tracer Tight licensee (Randy Golding RT 2:25).

8. A comparison of Tracer's third-party evaluation (Ex. 23) with Lab One's third-party evaluation (Exs. 24 and 25) shows that Defendants copied identically most sections of Tracer's third-party evaluation and copied substantially the remaining sections of Tracer's third-party evaluation (Randy Golding RT 1:110–118; Potter Deposition RT 3:63–69).

9. A page-by-page comparison of the Tracer Tight third-party evaluation and the Search third-party evaluation (Ex. 23A) is marked to show all text that is the same in both reports (Randy Golding RT 1:114–115).

10. A copy of the Search third-party evaluation contains a typographical mistake made in Tracer's original third-party evaluation (Randy Golding RT 2:17).

11. The MSD sheets used by Tracer (Exs. 54 and 55) were also used by NESCO and Lab One (Potter Deposition at 103:15; RT 2:92).

G. DEFENDANTS' COPYING OF TRACER'S STANDARD OPERATING PROCEDURES MANUAL

1. The elements of the Tracer Tight process, as outlined in Exhibit 38, have been copied substantially by Defendants in the Search operating manual (Exhibits 56 and 57, I attached hereto).

2. During training at NESCO, Tracer gave individual copies of Tracer's Standard Operating Procedures Manual to NESCO employees and reviewed the procedures with them (Ortrud Schuh RT 2:105–106; Ex. 29).

3. The Search training manual is marked as Exhibit 56 (Ortrud Schuh RT 2:107).

4. Exhibit 57 contains highlighted sections which compare excerpts of the Search training manual with corresponding sections from Tracer's procedures manual, training videotape or brochure (Ortrud Schuh RT 2:108–109).

5. Specific examples of copying by Defendants of the text of Tracer's procedures manual, videotape or brochure include:

a) the *site map forms* of Defendants use exactly the same procedure as Tracer for the site map checklist. The wording, pricing, location, vented pipes, field location, ground covering labels and order of presentation of the site map forms are the same as Tracer's forms (Ortrud Schuh RT 2:112);

b) the Search training manual includes *Tracer MSD sheets* with an "attachment number" which Tracer added, for example, Attachment 3002.4.1, Attachment 3002.4.2, etc. appear in both manuals. Included with Attachment 3002.4.5 to the Search manual is a diagram of a PVC soft-cover probe installation which does not relate to any other materials in the Search manual (Ortrud Schuh RT 2:114);

c) the *certification forms* identified in the Search training manual are the same as the Tracer certification forms, with minor changes (Ortrud Schuh RT 2:116).

H. NESCO'S NOTICE OF TERMINATION OF ITS LICENSE AGREEMENT WITH TRACER/BREACH OF TERMINATION PROVISIONS

1. By a letter dated December 1, 1992 from Eddy Patterson of NESCO to Tracer, Patterson notified Tracer of NESCO's termination of the License Agreement (Ex. 18).

2. Prior to NESCO's letter of December 1, 1992, Tracer was not notified that NESCO had discontinued use of the Tracer Tight process (Shannan Marty RT 1:56).

3. After December 1, 1992, Tracer made written demand for the return of Tracer's Confidential Information and Proprietary Equipment and Supplies (Ex. 19).

4. After NESCO terminated the License Agreement, Tracer did an analysis of the written materials and Proprietary Equipment and Supplies Tracer provided to NESCO and those which NESCO returned (Glen Lyon RT 2:182).

5. There were discrepancies between what Tracer's records showed should have been in NESCO's possession and what NESCO returned to Tracer (Glen Lyon RT 3:45).

6. While Tracer trained 36 employees of NESCO during the time NESCO was a Tracer licensee, NESCO returned to Tracer only ten procedure manuals (Glen Lyon RT 3:45–46).

7. After NESCO terminated its license on December 1, 1992, a NESCO order for 100 cans of tracer went out before Tracer's shipping department could be notified of the termination (Glen Lyon RT 3:46).

8. Defendants have not returned all Tracer Confidential Information and Proprietary Equipment and Supplies in their possession, despite Plaintiff's written demands (Shannan Marty RT 1:60).

I. DEFENDANTS' WRONGFUL USE OF THE TRACER TIGHT PROCESS IN PERFORMING MILITARY CONTRACTS

1. The Air Force approved the Tracer Tight process, using the tracer chemicals designated by Tracer for United States Air Force Base fuel tanks (Pat Mumme RT 2:122).

2. In November of 1992, Engineering Science sent a request for proposal to Tracer for leak detection testing of two tanks and certain piping at Brooks Air Force Base in San Antonio, Texas (Pat Mumme RT 2:137–138; Ex. 22).

3. Tracer decided not to bid on the Brooks Air Force Base project when it learned that NESCO would bid on the project while NESCO was a Tracer licensee (Pat Mumme RT 2:141).

4. In the Fall of 1992, NESCO was awarded the Brooks Air Force Base project contract in its capacity as a Tracer licensee (Pat Mumme RT 2:140).

5. NESCO performed the services at Brooks Air Force Base in mid-December of 1992 (Pat Mumme RT 2:141–142).

6. NESCO performed the Brooks Air Force Base project, using the tracer chemicals approved by the Air Force in 1986 at Tracer's request when Tracer applied for approval of the Tracer Tight process (Frank Morse Deposition 25:9; RT 2:142–143).

7. NESCO performed leak detection services for Brooks Air Force Base after NESCO's letter of December 1, 1992 to Tracer notifying Tracer of NESCO's termination of the License Agreement (Pat Mumme RT 2:141).

8. In the Fall of 1992, Fort Chaffee, Arkansas sent a request for quotation to Tracer and NESCO (Ex. 21; Mark Harris Deposition p. 41:7–13; RT 2:129–130).

9. The request for quotation specified the Tracer Tight process or the Tracer method for the project (Ex. 21, ¶ 2.0; Mark Harris Deposition p. 41:7–13; Pat Mumme RT 2:129–130).

10. Tracer chose not to bid on Fort Chaffee because NESCO had previously tested Fort Chaffee as a Tracer licensee and bid on the new project (Pat Mumme RT 2:125).

11. Tracer learned from Fort Chaffee that NESCO was awarded the project (Pat Mumme RT 2:131).

12. After December 1, 1992, Tracer learned NESCO had performed the leak detection services on the Fort Chaffee project, but there was no record that Tracer had performed the analytical testing on the tanks tested by NESCO (Pat Mumme RT 2:131).

13. Fort Chaffee verified that the supplier of the chemicals listed in the MSD sheets for Tracer C, D and F was Tracer Research and that if Tracer was not the supplier, the MSD sheets provided to Fort Chaffee in connection with the project would be misleading (Max Frauenthal Deposition p. 68 RT 2:132–133).

14. In Max Frauenthal's deposition transcript, Exhibit D, sub-¶ D, the letter from Defendant McCutchan to Fort Chaffee indicates that the MSD sheets for Tracer C, D and F are the chemicals to be used to inoculate tanks at Fort Chaffee (Pat Mumme RT 2:134).

15. NESCO tested the Fort Chaffee tanks before December 1, 1992, while still a Tracer licensee (Pat Mumme RT 2:136).

J. DEFENDANTS' TRADING ON GOODWILL OF TRACER—REGULATORY AUTHORITIES

1. The Tracer Tight process has been certified by a third-party evaluator as meeting the EPA protocol on safety and other requirements for detecting leaks in storage tanks and pipelines (Randy Golding RT 1:107–108).

2. Tracer has worked diligently over the last several years to obtain approvals of the Tracer Tight process from many state regulators. Because the Tracer Tight process is so different from the other leak detection processes which the regulators know, it has been difficult to obtain approvals (Glen Lyon RT 2:164).

3. Only last year did Tracer obtain approvals in almost all states (Glen Lyon RT 2:164).

4. Lab One's third-party evaluation of the Search leak detection system of November 2, 1992 appears substantially the same as Tracer's third-party evaluation of the Tracer Tight process of October 1990 (Randy Golding 1:114–115).

5. Approximately one-half of the state regulatory agencies require submission of an applicant's third-party evaluation as part of the regulator's review of the applicant's leak detection process (Glen Lyon RT 2:161–162).

6. Lab One's third-party evaluation so closely approximates the wording of Tracer's third-party evaluation that it could be confused with Tracer's third-party evaluation by some of the state regulators which have evaluated or are evaluating the Tracer Tight process (Glen Lyon RT 2:166).

7. Tracer has worked diligently over the past several years with California's regulatory agency to provide the information necessary to permit approval of the Tracer Tight process in California (Glen Lyon RT 2:164–165).

8. The Lab One third-party evaluation, which closely approximates the Tracer third-party evaluation, was submitted by Lab One for approval in California (Glen Lyon RT 2:166; Ex. 59).

9. The similarity between the Tracer Tight process and third-party evaluation and the Search process and evaluation may cause confusion to the state regulators both as to source and quality of the process for which approval is sought (Glen Lyon RT 2:166).

10. Because the state regulators that do not conduct an independent evaluation of a process tend to base their approvals on those obtained by an applicant in states which do conduct a thorough evaluation, Tracer's efforts to obtain approvals in states such as California provides Tracer with an advantage in obtaining approvals in other states which do not conduct their own evaluations (Glen Lyon RT 2:170–171).

11. Exhibit 34 lists the state agencies for underground storage tank facilities and indicates whether they are tested and the agency responsible for licensing of tank testers. Tracer provided the confidential information contained in Exhibit 34 to NESCO under the License Agreement. This information would be useful to Defendants in obtaining approvals from the state regulators for the Search process (Glen Lyon RT 2:180).

K. DEFENDANTS' TRADING ON GOODWILL OF TRACER—LICENSEES

1. Tracer developed a licensee or "affiliate program" to market the Tracer Tight process for underground storage tank and pipelines less than 1,000 feet in length. The program started in 1990 as a method to distribute services using the Tracer Tight process to tank customers throughout the United States (Glen Lyon RT 2:160).

2. In Tracer's affiliate program, the affiliates are licensed to contact customers, to introduce the tracer and inoculate the tank system, inspect and map the sites, install and locate the probes, and collect the samples of soil gas which are sent to Tracer for analysis (Glen Lyon RT 3:22).

3. Tracer analyzes the samples obtained by the affiliates, and reports the test results to the affiliates who in turn, report to their customers (Glen Lyon RT 3:22).

4. Defendants have a marketing structure that is identical to Tracer's affiliate program (Glen Lyon RT 3:23).

5. Defendants provide a license to the Search test method to their distributor, have the distributor install probe systems, inoculate the tanks, collect the samples, and send the samples to Lab One's Laboratory for analysis (Glen Lyon RT 2:185).

6. Lab One does the sample analysis and is paid a laboratory analysis fee by its distributors (Glen Lyon RT 3:23).

7. Because of the similarities between the Tracer affiliate program and the Search distributor system, prospective licensees of Tracer have indicated their confusion (Glen Lyon RT 3:28).

8. Tracer's provision of information on its pricing structure to NESCO under the Non-Disclosure Agreement has given NESCO an unfair advantage in determining the Defendants' pricing with their distributors to compete at lower prices against Tracer affiliates (Glen Lyon RT 3:38–39).

9. Tracer was advised by a Florida company in May of 1993 that it hesitated to enter into a license agreement with Tracer because of the existence of the Search method and the possibility of use by Defendants of Tracer's proprietary information (Glen Lyon RT 3:28–29).

10. Tracer was also advised by a Tennessee company that it hesitated to become a Tracer affiliate because of the existence of the Search method in the marketplace (Glen Lyon RT 3:29–30).

11. Tracer has had indications that NESCO and Lab One have tried to induce past and present Tracer licensees to become Search distributors by offering them a similar process to Tracer's with lower license fees than those required by Tracer (Glen Lyon RT 3:31–32; Hick Declaration to Plaintiff's Preliminary Injunction Motion).

L. DEFENDANTS' TRADING ON GOODWILL OF TRACER—CUSTOMERS

1. NESCO's customers for which it provided Tracer Tight process services when NESCO was an affiliate are customers of the Tracer Tight process. Those customers are now being offered services provided by Defendants under the Search name (Glen Lyon RT 3:35).

2. Tracer and Tracer's affiliates have lost jobs to NESCO (Shannan Marty RT 1:63–64).

3. The Army Corps of Engineers, Atlanta District, intended to award Tracer a three-year contract for leak detection services using Tracer Tight on a sole source award. NESCO's communication with the contracting officer at the Corps of Engineers has resulted in a delay in the contract award (Shannan Marty RT 1:63–64).

4. There is a closing market window for underground storage tank services because of new regulations in 1994 restricting tanks being placed in service. The existing confusion in the marketplace because of the Search tracer testing is affecting Tracer's ability to capture market share (Shannan Marty RT 1:65).

**CONCLUSIONS OF LAW**

To the extent any of these Conclusions of Law are deemed to be Findings of Fact, they

are hereby incorporated into the Findings of Fact.

Tracer has carried its burden of demonstrating the likelihood of success on the merits and irreparable injury and that the balance of hardships tips sharply in its favor.

█ An injunction against the use and disclosure of a trade secret that has been shown to have been misappropriated will preserve and not alter the proper status quo under the law. *Litton Systems, Inc. v. Sundstrand Corp.,* 750 F.2d 952 (Fed.Cir.1984).

█ Tracer has established a likelihood of success in proving:

1. Tracer, through its own efforts, has developed a unique process of leak detection in storage tanks and pipelines using chemical tracers injected into liquids in the liquid phase and detected outside a storage tank or pipeline in the gas phase.

█ 2. All of Tracer's leak detection process information used in connection with Tracer Tight(R) leak detection services, including the information described in Exhibit 38 and the Findings of Fact, section A 2, constitute trade secrets under the Arizona Trade Secrets Act, the Uniform Trade Secrets Act and the common law of Arizona.

3. All of Tracer's equipment and supplies used in connection with the Tracer Tight process, including the equipment and supplies described in Exhibit 38 and the Findings of Fact, section A 2, constitute trade secrets under the Arizona Trade Secrets Act, The Uniform Trade Secrets Act and the common law of Arizona.

4. The entire Tracer Tight process qualifies as legally protected trade secrets.

5. Tracer has maintained sufficiently the confidentiality of its Confidential Information and Proprietary Equipment and Supplies to preserve their status as trade secrets.

█ 6. Defendants NESCO, Patterson and McCutchan had access to all of Tracer's Confidential Information and Proprietary Equipment and Supplies used in connection with the Tracer Tight process solely by reason of Tracer's disclosure of the same, pursuant to the Non–Disclosure Agreement and License Agreement.

7. Defendants had a contractual and/or implied duty to refrain from disclosing or using any part or all of the Tracer Tight process in any manner not authorized by the confidential or contractual relationship.

8. Defendants disclosed and used the Tracer Tight process in violation of their contractual and/or implied obligations of confidentiality.

9. Each Defendant was at all times relevant to the Findings of Fact and now is the agent and employee of each of the other Defendants and was at all times and now is acting within the scope of said agency and employment.

10. Defendants' disclosure and use of the Tracer Tight process, including any part or all of Tracer's Confidential Information and Proprietary Equipment and Supplies, not authorized by Tracer, constitute trade secret misappropriation.

11. Defendants have misappropriated the Tracer Tight process and unfairly competed against Tracer by copying and using Tracer documents containing Tracer's Confidential Information, such as Tracer's third-party performance evaluation, Standard Operating Procedures Manual, and certification forms.

12. Defendants have misappropriated the Tracer Tight process and unfairly competed against Tracer by reproducing and using Tracer's Proprietary Equipment and Supplies.

13. Defendants have misappropriated the Tracer Tight process and unfairly competed against Tracer by using Tracer's Confidential Information and Proprietary Equipment and Supplies in their license of leak detection services to distributors and provision of said services to customers.

14. Defendants have caused confusion in the marketplace and unfairly competed by falsely representing to their distributors and customers that they developed their leak detection system, when in fact they misappropriated the Tracer Tight process and have offered it to distributors and customers at a lower price.

15. Defendants have caused confusion in the marketplace and unfairly competed against Tracer by imitating Tracer's licensee or affiliate program.

16. Defendants have caused confusion in the marketplace and unfairly competed against Tracer by providing to state regulatory agencies the third-party evaluation of their process, which was copied from Tracer's third-party evaluation.

17. As a consequence of Defendants' conduct, customers, licensees and regulatory agencies have been misled as to the origin and sponsorship of Defendants' leak detection services.

18. As a consequence of Defendants' conduct, the reputation and goodwill of Tracer has been irreparably injured.

19. Tracer is being immediately and irreparably harmed by Defendants' misappropriation and unauthorized use of the Tracer Tight process.

20. The issuance of a preliminary injunction will not harm Defendants more than a denial of the injunction would harm Tracer. The balance of hardship tips sharply in favor of Tracer.

21. The issuance of a preliminary injunction furthers the public interest.

22. Tracer is entitled to injunctive relief from Defendants' conduct pending the disposition of this action to prevent further damage to Tracer's reputation and goodwill and to correct the misconceptions of customers and licensees as to the origin and sponsorship of Defendants' leak detection services.

## ORDER

It is this Court's decision that Plaintiff is entitled to a Preliminary Injunction. The Court has entered its Findings of Fact and Conclusions of Law.

## TRADEMARK INFRINGEMENT

Upon consideration of Plaintiff's motion for preliminary injunction and the stipulation entered on record in open court between the parties as to Defendants' infringement of Plaintiff's federally registered "Tracer Tight" trademark, and Plaintiff's entitlement to the entry of a preliminary injunction, prohibiting such infringement and any continued infringement by Defendants,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that a preliminary injunction against Defendants is hereby GRANTED, as follows:

Defendants, their officers, agents, servants, employees and all persons in active concert or participation with them individually or jointly, shall be enjoined during the pendency of this action from:

1. using Tracer's registered service mark "Tracer Tight," or any colorable imitations thereof, in connection with the license, distribution, advertisement or sale of any leak detection or soil gas services;

2. doing any other act or thing likely to confuse, mislead or deceive the licensees, customers or potential licensees or customers of NESCO and Lab One, the customers or potential customers of Tracer, or members of the public, the United States government or the trade, to the effect that Defendants' services and related products are, in any way connected with, sponsored by, or approved by Tracer, or that NESCO or Lab One is an authorized licensee, seller or supplier of any of Plaintiff's services, including, without limitation, Tracer Tight services.

**IT IS FURTHER HEREBY ORDERED** that Defendants shall:

1. return to Tracer within 30 days of the date of this order any advertising materials, promotional brochures, procedure manuals or other written materials and any proprietary equipment and supplies of Tracer which display any infringement, copy, counterfeit, simulation or colorable imitation of Tracer's "Tracer Tight" service mark.

## TRADE SECRET MISAPPROPRIATION

Upon consideration of Plaintiff's motion for preliminary injunction and testimony presented in court, and it appearing to the court that Tracer Research Corporation (Tracer) is likely to succeed on the merits of its claims arising under the Lanham Act and the Arizona Trade Secrets Act against National Environmental Service company doing business

as NESCO, Lab One Analytical, Inc., Eddy Patterson and Albert McCutchan (Defendants), and that irreparable harm to Plaintiff, in the absence of a preliminary injunction, outweighs any harm that may be caused to Defendants upon the entry of a preliminary injunction and that the public interest requires the entry of a preliminary injunction,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that said motion be and hereby is GRANTED and that a preliminary injunction against the Defendants is hereby GRANTED, as follows:

The Defendants, their officers, agents, servants, employees and all distributors or other persons acting under the direction, control or in active concert or participation with them individually or jointly, shall be enjoined and restrained during the pendency of this action from:

1. engaging in, directly or indirectly, the business of selling, licensing, advertising, or distributing tracer chemical leak detection services or technology for underground and above ground petroleum and chemical storage tanks and pipelines, with the exception that to avoid prejudice to any innocent third party, Defendants may complete any testing which they are presently and actively engaged in as of the date of this order.

Defendants shall, within 10 days from the date of this order, file with the Court a list of tests they intend to complete and shall include the name and address of the client, complete details on the proposed testing to be completed, including the location of the tanks being tested. A copy shall be mailed to the Plaintiff by the Defendants;

2. soliciting or contacting, directly or indirectly, licensees, potential licensees or competitors of licensees of Tracer, with respect to tracer chemical leak detection services or technology for underground and above ground petroleum and chemical storage tanks and pipelines;

3. using, disclosing, disseminating or attempting to use, disclose or disseminate any trade secrets of Tracer, constituting a part of the Tracer Tight leak detection process;

4. using, disclosing, disseminating or attempting to use, disclose or disseminate any of the proprietary equipment or supplies of Tracer used in connection with the tracer chemical leak detection process;

5. using, licensing, distributing or attempting to use, license or distribute leak detection services or technology for underground and above ground petroleum and chemical storage tanks and pipelines, using any part or all of Tracer's patents;

6. disposing or destroying or attempting to dispose of or destroy any or all of Defendants' stock of chemical tracers and supplies that are identical or substantially similar to the supplies of chemical tracers and supplies used by Plaintiff in connection with the Tracer Tight leak detection process;

7. using, filing with or representing or attempting to use, file with or represent to the U.S. Environmental Protection Agency or any state regulatory agencies that Defendants' third-party evaluation of the Search leak detection process is based upon independent tracer chemical leak detection testing technology, developed and owned by any one or more of the Defendants;

8. representing or attempting to represent to any and all of Defendants' existing and potential licensees or distributors that the Search leak detection process is independently developed and owned by any one or more of Defendants;

9. using, disclosing or disseminating or attempting to use, disclose or disseminate to any and all of Defendants' existing or potential licensees any chemical tracers and supplies, equipment, procedures manuals, third-party performance evaluation reports, or any other information or equipment containing, in whole or in part, any trade secrets of Plaintiff, constituting any part or all of the Tracer Tight leak detection process;

10. Testing any air samples from test sites, using any tracer chemical leak detection process based in whole or in part upon any of Tracer's trade secrets or confidential information.

**IT IS FURTHER ORDERED AND DECREED** that Defendants shall:

1. Return to Plaintiff within 30 days of the date of this order any and all written

materials containing any part or all of the trade secrets constituting the Tracer Tight leak detection process, together with all copies and adaptations of the same, including, without limitation:

a) standard operating procedure manuals and addendums and portions thereof and Defendants' training manuals;

b) third-party performance evaluations of the Tracer Tight and Search processes;

c) written materials provided in training sessions by Tracer and Lab One and notes of the same;

d) Tracer's chemical supplier information, including Material Safety Data (MSD) sheets and forms, diagrams and tables;

e) promotional materials and advertising brochures of Tracer and Lab One;

2. Return to Plaintiff within 30 days of the date of this order any and all items of proprietary equipment and supplies in the possession of any one or more of Defendants and all of Defendants' distributors, including without limitation,

a) inoculation kits;

b) probe caps and probe tips used with installment of the same;

c) Tracer chemical canisters and tracer chemicals;

d) Training videotapes;

e) Tracer's certification cards and letters.

3. Account to Plaintiff within 30 days of the date of this order for any written materials, equipment and supplies not returned to it.

4. Provide a copy of this order by certified mail, return receipt requested to all of Defendants' distributors or licensees, with copies of the proof of mailing to be provided by Defendants to the Court and the Plaintiff within 30 days of the date of this order.

**IT IS FURTHER ORDERED AND DECREED** that within 10 days of the date of this order, the Plaintiff shall file a bond in the sum of $100,000, conditioned for payment of such costs and damages as may be incurred or suffered by Defendants.

**IT IS FURTHER ORDERED AND DECREED** that this preliminary injunction shall continue in full force and effect until further order of this Court.

## MEMORANDUM OF DECISION

On September 3, 1993, the Court entered its Findings of Fact and Conclusions of Law and Order granting Plaintiff Tracer Research Corporation's (hereinafter "Tracer") Motion for Preliminary Injunction, to be incorporated by reference in this Memorandum of Decision.

## DISCUSSION

Tracer originally filed this action seeking injunctive relief to enjoin Defendants National Environmental Service Company, (d/b/a NESCO), Lab One Analytical, Inc.; Eddy Patterson; and Albert McCutchan (hereinafter collectively referred to as "Defendants") from the misappropriation of trade secrets Tracer has developed over years at great expense concerning a process for detecting, locating and quantifying leaks in underground and above ground petroleum and chemical storage tanks and pipelines.

Defendants assert, in opposition to Tracer's allegations, that a preliminary injunction should be denied because Tracer has failed to: (1) identify and prove its trade secrets with specificity; (2) identify a trade secret that has independent economic value; (3) demonstrate a reasonable effort to maintain secrecy; (4) show a probability of success on or the existence of a serious question going to the merits; and (5) to show the possibility of irreparable injury without such injunction or a balance of hardships tipping sharply in its favor.

### I. Injunctive Relief

The Lanham Act, 15 U.S.C. § 1116 and Arizona law, A.R.S. § 44–1451(B) and the Arizona Trade Secrets Act, A.R.S. §§ 44–401 through 44–407, empower this Court to issue a preliminary injunction enjoining the Defendants from trademark infringement and/or misappropriation of trade secrets.

For issuance of a preliminary injunction, the Court of Appeals for the Ninth Circuit has determined that the applicant must show either (1) a combination of probable success on the merits and the possibility

of irreparable injury if relief is not granted, or (2) the existence of serious questions going to the merits and that a balance of hardships tips sharply in its favor. *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir.1987); *Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 723 (9th Cir. 1985); *Apple Computer, Inc. v. Formula International, Inc.*, 725 F.2d 521, 523 (9th Cir. 1984). Once the applicant has demonstrated a likelihood of success on the merits, it is presumed that it will suffer irreparable and immediate harm. *Apple Computer, Inc. v. Formula International, Inc.*, 725 F.2d at 526.

As set forth in the Court's Findings of Fact and Conclusions of Law, Tracer has proven a likelihood of success on the merits, Defendants' actions demonstrate the probability of irreparable injury, and serious questions going to the merits of this action have been raised. Accordingly, all the requirements for the issuance of a preliminary injunction have been met.

II. Process Taken As a Whole

The evidence presented demonstrates that Tracer's process, taken as a whole, constitutes a protected trade secret.

It is undisputed that Arizona law applies to the trade secret issues in this proceeding. The Arizona Trade Secrets Act, which adopts the Uniform Trade Secrets Act, provides:

> 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique or process, that both:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

A.R.S. § 44–401(4).

■ Among the factors the Court must consider in determining whether a trade secret exists are: (1) the degree of secrecy surrounding the process both inside and outside the plaintiff's business, (2) the plaintiff's efforts to develop the process and to preserve its secrecy, (3) its value to the plaintiff and to its competitors, and (4) the difficulty with which it could be duplicated by others. *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 732 F.Supp. 370, 375 (S.D.N.Y.1989).

Certain essential elements of Tracer's Confidential Information and Proprietary Equipment and Supplies, set forth in the "Outline of the Tracer Tight Trade Secret Process," [1] characterize Tracer's leak detection system process as a whole. It is well established that while general concepts, each of which, by itself, are not protected as trade secrets, "the specific implementation involving a particular combination of general concepts may well amount to a trade secret." *Id.* at 376 (quoting *Cybertek Computer Products, Inc. v. Whitfield et al.*, 203 U.S.P.Q. 1020 (BNA) (Cal.Super.1977)). The Court in *Cybertek*, relying on the principles applied in *Winston Research Corp. v. Minnesota Mining & Manufacturing Co.*, 350 F.2d 134, 140, 146 U.S.P.Q. 422, 426 (9th Cir.1965), held:

> [T]he specification of these basis mechanical elements and their relationship to each other ... were not publicly known, were arrived at only after painstaking research and extensive trial and error, and therefore, constituted a trade secret entitled to protection. In other words, the court found that the specific embodiment of the general concepts and approach into a combination of parts was protectable, even though all or some of them might well be known to the industry.

*Cybertek*, supra.

Tracer has also shown that specific elements of the Tracer Tight process, as set forth in the Findings of Fact and Conclusions of Law, are also entitled to protection.

III. Misappropriation

In consideration of the factors which determine the existence of a trade secret and whether there has been a misappropriation of Tracer's leak detection process, the evi-

1. Plaintiff's Exhibit 38.

dence presented establishes that Defendants have misappropriated Tracer's trade secrets.

All Tracer need show is that it made reasonable efforts to maintain confidentiality. *K-2 Ski Co. v. Head Ski Co.*, 506 F.2d 471, 474 (9th Cir.1974). The owner of a trade secret does not abandon his secret by limited publication of the secret for a restricted purpose, *Motorola, Inc. v. Computer Displays International, Inc.*, 739 F.2d 1149, 222 U.S.P.Q. 844, 852-53 (7th Cir.1984); or by disclosure to employees on a need-to-know basis. *Digital Development Corp. v. International Memory Systems*, 185 U.S.P.Q. 136 (S.D.Cal.1973). The limited disclosure required at test sites does not reveal the essence of the process claimed.

The License and Non-Disclosure Agreements obligated Defendants to maintain the Tracer Tight process confidential. Based on the provisions of the contracts between Tracer, NESCO and its officers Patterson and McCutchan, the information imparted by Tracer to Defendants was for use in the context of a confidential relationship.

Tracer has demonstrated, as set forth in detail in the Findings of Fact and Conclusions of Law, Defendants' misappropriation of the Tracer Tight process and the copying of Tracer's third-party performance evaluation of the Tracer Tight process and Tracer's Standard Operating Procedures Manual. Tracer has further substantiated its position that none of the information available to the Environmental Protection Agency, the United States Air Force, state agencies or in connection with prior patents demonstrates that Tracer's trade secrets were in the public domain before Tracer and NESCO entered into the License Agreement, nor that they have become part of the public domain thereafter. Regardless of the extent to which the general nature of Tracer's process had been publicly disclosed, Defendants resorted to copying and using Tracer's process in great detail rather than independently developing the same.

Based on the foregoing, in incorporation with the Findings of Fact and Conclusions of Law, Plaintiffs are entitled to a Preliminary Injunction.